## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Creekside Associates, Ltd., | : | Case No. 14-19952 (SR) |
| | : | |
| Debtor. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CREEKSIDE JV OWNER, LP TO DISMISS THE CHAPTER 11 BANKRUPTCY CASE PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 1112(b) AND 305(a)**

John C. Goodchild, III (PA #74856)
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
jgoodchild@morganlewis.com

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   LEGAL STANDARD ............................................................................................. 2

    A.   Dismissal under 11 U.S.C. § 1112(b) for Lack of Good Faith................................. 3

    B.   Dismissal under 11 U.S.C. § 305(a) ......................................................................... 3

III.  FACTUAL BACKGROUND .................................................................................... 4

    A.   Creekside Associates' Current Financial Condition ................................................. 4

        1.   Creekside Associates' Scheduled Assets ...................................................... 4

        2.   Creekside Associates' Scheduled Liabilities ................................................ 6

    B.   The Loan and Loan Documents. .............................................................................. 8

    C.   The Events of Default................................................................................................ 9

        1.   Creekside Associates' Default of its Payment Obligations ......................... 9

        2.   Creekside Associates' Obligation to Serve as a Single Purpose Entity.... 12

    D.   The State Court Actions .......................................................................................... 13

        1.   Creekside Associates' Answers and Counterclaims ................................... 13

        2.   Creekside Associates' Efforts to Avoid Trial ............................................ 15

IV.   ARGUMENT ........................................................................................................ 17

    A.   Creekside Associates Cannot Demonstrate a Good Faith Basis for its Petition .... 18

        1.   Chapter 11 is Not Necessary to Protect the Estate..................................... 19

        2.   Creekside Associates Petitioned for Bankruptcy to Obtain a Litigation
           Advantage .................................................................................................. 22

        3.   Numerous Additional Factors Favor a Finding of Bad Faith .................... 23

    B.   Creekside Associates is Unable to Confirm a Plan ................................................ 26

    C.   Alternatively, the Petition Should be Dismissed Under 11 U.S.C. § 305(a).......... 28

V.    CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 15375 Mem'l Corp.,*
    589 F.3d 605 (3d Cir. 2009)...................................................................................3, 18

*In re 3 RAM, INC.,*
    343 B.R. 113, 117-18 (Bankr. E. D. Pa. 2006) .........................................17, 22, 26

*In re Albany Partners, Ltd.,*
    749 F.2d 670 (11th Cir. 1984) ...............................................................................26

*In re Argus Grp. 1700, Inc.,*
    206 B.R. 737 (Bankr. E.D. Pa. 1996), *aff'd,* 206 B.R. 757 (E.D. Pa. 1997).....................22, 29

*In re Bus. Info. Co.,*
    81 B.R. 382 (Bankr. W.D. Pa. 1988) .......................................................................3

*In re Combustion Eng'g, Inc.,*
    391 F.3d 190 (3d Cir. 2004)...................................................................................27

*In re Corinthian, LLC,*
    440 B.R. 97 (Bankr. E.D. Pa. 2009) .........................................................................3

*In re DCNC North Carolina I, LLC,*
    407 B.R. 651 (Bankr. E.D. Pa. 2009) ......................................................17, 22, 23, 26

*In re Forever Green Athletic Fields, Inc.,*
    500 B.R. 413  (Bankr. E.D. Pa. 2013), *aff'd sub nom., Forever Green Athletic Fields,*
    *Inc. v. Dawson,* 514 B.R. 768 (E.D. Pa. 2014) ........................................................19

*In re Integrated Telecom Express, Inc.,*
    384 F.3d 108 (3d Cir. 2004)...................................................................17, 21, 22

*In re JER/Jameson Mezz Borrower II, LLC,*
    461 B.R. 293 (Bankr. D. Del. 2011) ..................................................................18, 21

*In re Mazzocone,*
    183 B.R. 402 (Bankr. E.D. Pa. 1995), *aff'd,* 200 B.R. 568 (E.D. Pa. 1996) ..........................29

*In re Mazzocone,*
    200 B.R. 568 (E.D. Pa. 1996) ..................................................................................4

*In re Primestone Inv. Partners L.P.,*
    272 B.R. 554 (D. Del. 2002) ..............................................................................18, 21

*In re RYYZ, LLC,*
    490 B.R. 29 (Bankr. E.D.N.Y. 2013) ..............................................28

*In re S. Canaan Cellular Invs., LLC,*
    420 B.R. 625 (E.D. Pa. 2009) ..............................................4, 28

*In re SB Properties, Inc.,*
    185 B.R. 198 (E.D. Pa. 1995) ..............................................24

*In re SGL Carbon Corp.,*
    200 F.3d 154 (3d Cir. 1999) ..............................................17, 18, 22

*In re State St. Houses, Inc.,*
    356 F.3d 1345, 1347 (11th Cir. 2004) ..............................................18

*In re Stingfree Technologies Co.,*
    427 B.R. 337 (E.D. Pa. 2010) ..............................................24

*In re Swedeland, Dev. Group, Inc.,*
    16 F.3d 552 (3d Cir. 1994) ..............................................27

*In re Union Meeting Partners,*
    178 B.R. 664 (E.D. Pa. 1995) ..............................................28

*In re Windsor on the River Associates, Ltd.,*
    7 F.3d 127 (8th Cir. 1993) ..............................................27

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,*
    808 F.2d 363 (5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365 (1988) ..............................................21

STATUTES

11 U.S.C. § 305(a) ..............................................2, 3, 4, 28

11 U.S.C. § 1112(b) ..............................................2, 3, 17, 26

11 U.S.C. § 1129(a) ..............................................27, 28

## I.    PRELIMINARY STATEMENT

Creekside Associates, Ltd. ("Creekside Associates" or "Debtor") filed this single-asset real estate case solely to benefit its equity holders by avoiding foreclosure, which is not a valid reorganizational purpose.  This proceeding is yet another step in a three-year legal saga by Israel Feit ("Feit"), equity holder of a debtor that represents itself in its schedules as solvent.  During these years Feit had a choice to either cause Creekside Associates to refinance its mortgage at market financing rates or battle Creekside Associates' only secured lender to avoid its legal obligations following a strategic default under the mortgage; he consistently chose the latter course and has continued that decision in this Court.  The casualties of this tactic in this Court, however, are the unsecured creditors.  Debtor has acknowledged that it can, and outside of Chapter 11 would, pay all of its claims in full, in cash – however, during the bankruptcy those creditors must wait, for no good reason.  Debtor's recent motion to extend exclusivity deep into the summer, without any meaningful progress toward a plan or a financing commitment, shows that, absent relief here, those creditors will continue to be held hostage to the equity holder's efforts.

Creekside Associates is not in need of "restructuring."  A single-asset debtor, it has one residential real estate property, few unsecured creditors (all of whom were in current payment status as of the bankruptcy filing) and more than enough cash on hand and operating cash flow to continue to pay all of its trade and other obligations in the ordinary course, as demonstrated through its own submissions in its Schedules on January 23, and its testimony at the Section 341 Examination on February 19.  While Creekside Associates has a disagreement with the Bucks County Water and Sewer Authority (the "BCWSA"), prior to filing for bankruptcy, Creekside Associates and BCWSA entered into a framework for resolving the disagreement, which

included a fully funded escrow. Further, if needed, Creekside Associates maintains plenty of additional cash and adequate operating cash flow to cover what it might have to pay to the BCWSA both for past bills and for future water and sewer services. The only thing that Creekside Associates could not – or would not – do is refinance the secured debt on terms that might harm the return on investment of its equity holder, Feit. There is no rehabilitative purpose for this Chapter 11.

Ostensibly prompting the Petition was an upcoming trial in state court against Creekside Associates' only secured creditor, Creekside JV Owner, LP ("Lender"). The dispute with Lender arose from Creekside Associates' only prepetition financing: a loan secured by substantially all the Debtor's assets. Efforts to avoid paying market financing rates (whether on that loan or a refinanced one) date from August 2010, when, despite more than ample liquidity, Creekside Associates chose to strategically default on its secured loan, risking default interest in an effort to strong-arm the lender into taking a payoff at a steep discount. Litigation ensued; after Creekside Associates' defense theories were repudiated through the grant of partial summary judgment by the state court, Debtor engaged in a lengthy effort to delay the completion of those state court proceedings. With those delays finally exhausted and a trial date pending, Creekside Associates sought relief here.

Because bad faith has animated Creekside Associates' approach for years, and it cannot confirm a plan of reorganization, the case should be dismissed pursuant to either Section 1112(b) or Section 305(a) of the Bankruptcy Code.

## II.    LEGAL STANDARD

A Chapter 11 bankruptcy is subject to dismissal under Section 1112(b) if filed for no good-faith purpose, or under Section 305(a)'s abstention analysis. *In re Bus. Info. Co.*, 81 B.R.

382, 384 (Bankr. W.D. Pa. 1988).  The analyses under these sections overlap but are distinct in

the law.

A.    **Dismissal Under 11 U.S.C. § 1112(b) for Lack of Good Faith**

Chapter 11 bankruptcy petitions are "subject to dismissal under 11 U.S.C. § 1112(b)

unless filed in good faith and the burden is on the bankruptcy petitioner to establish [good faith]."

*In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (citing *In re Integrated Telecom*

*Express, Inc.* ("*Integrated Telecom*"), 384 F.3d 108, 118 (3d Cir. 2004)).  The decision to

dismiss a Chapter 11 case pursuant to Section 1112(b) rests within the "sound discretion of the

bankruptcy court." *In re Corinthian, LLC*, 440 B.R. 97, 102 (Bankr. E.D. Pa. 2009).

"Whether the good faith requirement has been satisfied is 'a fact intensive inquiry' in

which the court must examine 'the totality of facts and circumstances' and determine where a

'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'"

*15375 Mem'l Corp.*, 589 F.3d at 618 (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d

Cir. 1999)).  The inquiry is based more on an "objective analysis of whether the debtor has

sought to step outside the equitable limitations of Chapter 11 than the subjective intent of the

debtor." *Id.* at 618 n.8.  These limitations are meant to "deter filings that seek to achieve

objectives outside the legitimate scope of the bankruptcy laws." *Id.*

B.    **Dismissal Under 11 U.S.C. § 305(a)**

Under 11 U.S.C. § 305(a), the Court, "after notice and a hearing, may dismiss a case

under this title, or may suspend all proceedings in a case under this title, at any time if . . . the

interests of creditors and the debtor would be better served by such dismissal or suspension." 11

U.S.C. § 305(a).

> [D]ismissal under § 305 is left to the discretion of the Bankruptcy Court, which in
> making this decision, considers a wide variety of factors including but not limited

to: who filed the bankruptcy petition, the availability of another forum to handle the pending disputes, the necessity of federal proceedings to achieve a just and equitable solution, the expense of the federal proceedings in comparison to the proceedings in another forum, the purpose of the party seeking to remain in bankruptcy court, the economy and efficiency of having the bankruptcy court handle the matter and the possible prejudice to various parties.

*In re S. Canaan Cellular Invs., LLC,* 420 B.R. 625, 631 (E.D. Pa. 2009).  If the bankruptcy court

is being used as a forum to resolve what is essentially a two-party dispute, this factor may also be

considered in deciding whether to apply Section 305(a).  *In re Mazzocone*, 200 B.R. 568, 575

(E.D. Pa. 1996).

## III.    FACTUAL BACKGROUND

### A.    Creekside Associates' Current Financial Condition

#### 1.    Creekside Associates' Scheduled Assets

Creekside Associates filed its Schedules of Assets and Liabilities and Statement of

Financial Affairs on January 23, 2015 (the "Schedules"), listing assets of $93,352,652.13. Dkt.

No. 69.

The single largest asset, valued by Creekside Associates at $85,000,000, is certain real

and personal property located in Bucks County, Pennsylvania known as Creekside Apartments, a

complex featuring over 1,000 units located at 2500 Knights Road, Bensalem, Pennsylvania,

Parcel Nos. 02-036-295 and 02-024-001 (the "Property").  At the Section 341 Examination,

conducted on February 19, 2015, Feit testified that the $85,000,000 value was based upon the

income generated by the Property.  Feb. 19, 2015 Tr. 6:12–23 (Attached as Exhibit 1 to the

Declaration of John C. Goodchild, III (hereinafter, Goodchild Decl. Exh. 1)).

Creekside Associates also lists roughly $1,470,000 in cash on hand (Dkt. No. 71 at 5) –

significantly more than the sum total of all Creekside Associates' unsecured claims, excluding

the disputed liability to BCWSA.  In addition, Creekside Associates maintains a contingent

interest in over $600,000 in tenant security deposits held in money market accounts and over

$830,000 in escrow as part of the resolution framework agreed upon with BCWSA. *Id.*

The Debtor's second largest asset is $4,674,000 in "friend and family loans" to a Feit-controlled entity, Kerridge Equities Corp. ("Kerridge"). Dkt. No. 71 at 64. Owned by Feit's children (Feit Dep. 84:9–23 (Attached as Exhibit 13 to Addendum to Proof of Claim of Creekside JV Owner, LP (hereinafter, POC Exh. 13)), Kerridge operates under the full control of Feit. Feb. 19, 2015 Tr. 22:2–11, 23:6–13 (Goodchild Decl. Exh. 1); Feit Dep. 81:19–82:5, 64:18–65:2 (POC Exh. 13). Though it is believed that substantially more money was transferred prepetition from Creekside Associates to Kerridge,[1] only $300,000 has been repaid. Feit Dep. 87:16–22 (POC Exh. 13). Creekside Associates' Schedules identify $4,300,000 of the loans to Kerridge as collectible property of the estate. Dkt. No. 71 at 64.

Kerridge's role illustrates that this case is not a legitimate restructuring of the Debtor, but an effort by the equity holder, Feit, to avoid paying market rates for senior financing. Though Kerridge holds significant sums separately from Debtor, these funds are available to Debtor. Kerridge contributed to the payment of bankruptcy counsel for Creekside Associates – paying at least $50,000 toward Creekside Associates' bankruptcy counsel's fees and expenses. McMichael Decl. ¶ 6 (Dkt. No. 4-1). Including the significant assets held by Kerridge, the amount of cash available to Creekside Associates significantly exceeds the sum of its unsecured liabilities. Notably, even though Creekside Associates is in Chapter 11, Feit does not believe Debtor has any need for the money held by Kerridge. Feb. 19, 2015 Tr. 23:19–24:5 (questioning "why" Creekside Associates would seek to get its money back from Kerridge and testifying that he does not "see any reason to bring back the money now") (Goodchild Decl. Exh. 1). A

---

[1]    Feit has previously testified that roughly $5.6 million had been transferred to Kerridge. Feit Dep. 87:14–16.

legitimate debtor in possession seeking to restructure and acting in good faith would certainly "see a reason" to recover more than $4 million for the benefit of the estate and its creditors.

### 2.    Creekside Associates' Scheduled Liabilities

Creekside Associates' Schedules indicate that Lender, the Movant herein, holds the sole secured claim, scheduled in the amount of $84,000,000 (Dkt. No. 73), and the unsecured creditors hold claims amounting to $4,100,436.06 (Dkt. No. 75), for total liabilities of $88,100,436.06. Dkt. No. 69. The $4,100,436.06 in scheduled unsecured claims comprises the disputed claim of BCWSA (listed at $3,812,824.37) and a number of small, ordinary-course, current debts amounting to about $300,000. Dkt. No. 75.

BCWSA's claim against Creekside Associates arises from unpaid invoices with respect to BCWSA's agreement to supply water and sewage service to the Property and the calculation of BCWSA's charges for its services related to same. *See* Feb. 19, 2015 Tr. 15:16–17:14 (Goodchild Decl. Exh. 1). Creekside Associates and BCWSA were in discussions prior to the Petition Date regarding the resolution of the outstanding invoices. *Id.* at 17:15–24. BCWSA had filed a lien against the Property for such unpaid services, however, as a result of discussions with Creekside Associates and the fact that Creekside Associates had maintained funds for BCWSA in escrow, BCWSA agreed to withdraw its liens on or about March 13, 2013 and was not actively seeking to enforce Creekside Associates' obligations other than through mutual negotiation. *Id.* at 29:6–25; *see also* Notices of Removal of Liens (Goodchild Decl. Exhs. 29 & 30); Dkt. No. 71, at 5 (listing roughly $830,000 held in escrow for BCWSA). Thus, the BCWSA claim is subject to a framework for settlement, was under negotiation at the time the Petition was filed, and is covered by an existing escrow plus Creekside Associates' ample cash on hand.

The few other unsecured claims amounting to about $300,000 (including scheduled liabilities to a number of companies controlled by Feit) relate to the usual business operations of Creekside Associates. Significantly, Creekside Associates was current with all payments as of the Petition Date. Feb. 19, 2015 Tr. 22:8–17 (Goodchild Decl. Exh. 1). No creditor sought to collect any past due amounts or made a demand of Creekside Associates leading up to the filing of the Petition. *Id*. at 22:18–21. Nor was Creekside Associates in any dispute with any of its other unsecured creditors. *Id*. at 21:14–22:1 (There is "[n]o dispute with anybody except sewer authorities and the Creekside JV [Lender]. All others are going to be paid in full.").

Thus, Creekside Associates was in a position to pay all of its unsecured obligations at the time of the filing of the Petition, and was in fact paying its debts in the ordinary course. Creekside Associates' secure financial condition is demonstrated through its own financial statements. In the past three years, Creekside Associates provided quarterly financial reports to Lender, none of which showed an inability to pay its debts as they came due. Moreover, reviewing Creekside Associates' financial statements shows that the financial position of Creekside Associates has improved over that time period. The cash on hand of Creekside Associates steadily improved, as shown on the following chart:

|      | Cash on Hand at End of Period |
|------|-------------------------------|
| 2011 | $150,957                      |
| 2012 | $755,744                      |
| 2013 | $2,237,641                    |
| 2014 | $2,960,235                    |

*Cf.* Q4 2011 Financial Report (Goodchild Decl. Exh. 9); Q4 2012 Financial Report (Goodchild Decl. Exh. 10); Q4 2013 Financial Report (Goodchild Decl. Exh. 11); Q4 2014 Financial Report (Goodchild Decl. Exh. 12). Creekside Associates' liquidity has improved significantly in recent

years.   Creekside Associates has also seen a corresponding increase in total income from
$9,803,805.77 in 2011 to $10,126,135.86 in 2014.   *Cf.* Q4 2011 Financial Report (Goodchild
Decl. Exh. 9); Q4 2014 Financial Report (Goodchild Decl. Exh. 12).

Moreover, a review of Creekside Associates' most recent report covering the past year
does not show any event or circumstance preceding the Petition Date that would warrant the
protection of the Bankruptcy Court.   Indeed, the financial condition of Creekside Associates has
been largely consistent throughout the past year.   *See, e.g.*, Q4 2014 Financial Report (Goodchild
Decl. Exh. 12).

### B.   The Loan and Loan Documents

Creekside Associates is a limited partnership owned by Bensalem Investors and
Creekside Management, LLC.   Feb. 19, 2015 Tr. at 4:10–22 (Goodchild Decl. Exh. 1).
Bensalem Investors is owned by a number of individuals, including Israel Feit, the principal of
Creekside Associates and indirect owner of Creekside Management, LLC.   *Id.* at 10:7–11:3.   On
December 14, 2000, Creekside Associates acquired the Property.   Five years later, in 2005,
Creekside Associates borrowed $68,000,000 (the "Loan") to refinance existing debt on the
Property pursuant to the Loan Agreement.   *See* Loan Agreement (POC Exh. 2).   In conjunction
with the Loan, Creekside Associates and the original lender, Eurohypo AG, executed a
Promissory Note (the "Note," POC Exh. 3), the Loan Agreement, and an Open-End Mortgage
and Assignment of Rents and Fixture Filing (the "Mortgage," POC Exh. 9), and Feit executed a
Guaranty of Recourse Obligations (the "Guaranty," POC Exh. 6).   The Note, Loan Agreement,
Mortgage, Guaranty and related documents executed in connection with the Loan and any
assignment of such documents are hereinafter collectively referred to as the "Loan Documents."

Lender purchased the Loan Documents in November 2011 and is now the owner of the Loan Documents (including, but not limited to, the Note, Loan Agreement, Guaranty and Mortgage).  *See* Loan Sale Agreement (Goodchild Decl. Exh. 8).  Lender received the Loan Documents by virtue of assignment from Wells Fargo Bank, N.A. as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2005-LDP4, successor-in-interest by assignment to Eurohypo. True and correct copies of the Omnibus Assignment and Assignment of Loan Documents are attached to the Addendum to Proof of Claim as Exhibits 7 & 8.

### C.    The Events of Default

#### 1.    Creekside Associates' Default of Its Payment Obligations

In the Loan Agreement, Creekside Associates agreed that the loan payment schedule would be "interest only" (plus reserve payments and estimated insurance, taxes and capital expenditures) for five years and then, starting in August 2010, the payment would increase to "principal plus interest."  In spring 2010, Feit decided that the rents generated at the Property likely would not be sufficient to pay the mortgage once the "interest only" period ended in August 2010.  Feit Dep. 67:23–69:9 (POC Exh. 13).  Even though Creekside Associates always had, or had access to, the cash required to make its mortgage payments (including through the use of some of the $38 million that it had received from the refinancing transactions), Creekside Associates decided to attempt to either modify the Loan or pay off the Loan at a steep discount. *Id.* at 256:2–10.

To this end, Feit hired Timothy Pribisco, a longtime business acquaintance, and asked him to assist in negotiating a modification of the payment provisions of the Loan Documents. *See* Mar. 23, 2010 email (Goodchild Decl. Exh. 2). Thereafter, on May 17, 2010, Creekside

Associates and Feit communicated to the former lender under the Loan Documents that it would be unable to make the monthly payments of interest and principal in the amounts required by the Loan Documents. *See* May 17, 2010 email and attachment (Goodchild Decl. Exh. 4).

The former lender engaged a special servicer, represented by John Sobenes, to continue discussions with Creekside Associates and Pribisco regarding Creekside Associates' failure to make payment in full. On or about June 2, 2010, notice was provided to Creekside Associates that Sobenes would act as special servicer. *See* June 2, 2010 Correspondence and Negotiation Disclosure Statement (Goodchild Decl. Exh. 5). The notice specifically disclosed to Creekside Associates that "[r]eceipt and acceptance of loan payments (partial or otherwise) shall in no way be considered a waiver of any defaults," and attached a Negotiation Disclosure Statement that notified Creekside Associates that the special servicer did not have the authority to bind the lender and that, while the parties may discuss potential resolutions, no party "shall be bound by any such understanding unless and until it has been reduced to a written agreement and signed by all necessary parties." *Id.*

Thereafter, Pribisco and Sobenes engaged in discussions regarding Creekside Associates' indebtedness, with Creekside Associates proposing to purchase the Note at a significant discount. Creekside Associates' offers were rejected and no agreement was reached.

Between August 2010 and January 2011, Creekside Associates failed to make the payments required under the Loan Documents. The failure to make a full payment of principal and interest was an Event of Default under the Loan Agreement. Loan Agreement § 10.1(a)(i) (POC Exh. 2). Creekside Associates was aware that the failure to make full payment was a default of its obligations, as Feit noted to Pribisco on July 23, 2010: "[O]nce we pay interest only next month we are in default." *See* July 23, 2010 Feit email (Goodchild Decl. Exh. 6). On

January 7, 2011, Lender's predecessor-in-interest sent Creekside Associates and Feit a Notice of

Default (the "First Notice of Default," POC Exh. 14) advising them of the default for failing to

make payments since October 11, 2010 as required under the Loan Documents. The First Notice

of Default demanded immediate payment in full including all past-due amounts.

Thereafter, Lender purchased the Loan Documents in December 2011. On December 27,

2011, Lender sent a second notice of default (the "Second Notice of Default," POC Exh. 15) to

Creekside Associates and Feit. This Second Notice of Default advised Creekside Associates and

Feit that Creekside Associates was in default of the Loan Agreement and the Mortgage for

failure to make its required monthly installment payments. This Second Notice of Default also

demanded immediate payment of all amounts due and owing pursuant to the Loan Documents.

When Creekside Associates learned that Lender had purchased the Note, Feit "cleaned the

accounts," pulling all of the cash out of Creekside Associates' bank accounts and transferring it

to Kerridge. Feit Dep. 124:14–21 (POC Exh. 13).[2] These transfers, totaling $456,636.11, were

made to Kerridge after Creekside Associates received the Second Notice of Default. *See*

Summary of Transfers to Kerridge Equities (Goodchild Decl. Exh. 7).

In response to the notices of default, neither Creekside Associates nor Feit ever wrote to

Lender (or its predecessors-in-interest) denying that Creekside Associates was in default. They

did not send any written protest suggesting that the Loan Documents had been modified by

Sobenes. Nor did Creekside Associates orally suggest any such modification of the Loan

Documents. Rather, Creekside Associates (while represented by counsel) sought to negotiate,

executing a letter agreement dated January 4, 2012 ("Pre-Negotiation Agreement") in which

Creekside Associates acknowledged and agreed that it was in default of its obligations and duties

---

[2]    Feit testified that the money was subsequently returned after Creekside Associates was able to strike the
confession of judgment. Feit Dep. 124:22–125:4 (POC Exh. 13).

under the Loan Documents and that there had been no oral modifications of the Loan Documents.

*See* Jan. 4, 2012 Agreement (POC Exh. 16).

### 2.    Creekside Associates' Obligation to Serve as a Single Purpose Entity

An essential consideration in making the Loan was Creekside Associates' agreement and

obligation to act as a single purpose entity.  This requirement is specifically set out in Section

3.1.24 of the Loan Agreement (titled "Single Purpose"), providing that Creekside Associates

shall not "engage in any business other than the ownership, management and operation of the

Property."  Loan Agreement § 3.1.24(b) (POC Exh. 2).  This covenant prohibited Creekside

Associates from "mak[ing] any loans or advances to any third party (including any Affiliate or

constituent party)."  *Id.* § 3.1.24(e).  In breach of this covenant, Creekside Associates made

numerous loans throughout the years, as acknowledged by Feit and as set forth in the Schedules.

Feb. 19, 2015 Tr. at 9:9–14:25 (Goodchild Decl. Exh. 1); Dkt. No. 71 at 64.  Feit also testified to

his using Creekside Associates as the entity through which he engaged in his business as a "hard

money" lender.  Feit Dep. at 95:8–16 (POC Exh. 13).

The Loan Agreement provides that it is an Event of Default if Creekside Associates

"breaches any representation, warranty or covenant contained in <u>Section 3.1.24</u> hereof."  Loan

Agreement § 10.1(a)(xii) (POC Exh. 2).  Thus, each of the loans made by Creekside Associates

violated its obligation to act with a single business purpose and was an Event of Default under

the Loan Agreement, triggering Lender's entitlement to Default Rate interest and the costs

incurred to collect the debt owed to Lender, including attorneys' fees. *Id.* §§ 2.2.3, 10.3.

Separate and apart from the failure to adhere to the single business purpose obligations,

there are numerous other Events of Default.  Creekside Associates also defaulted on the Loan

Documents by, among other things, making loans to its investors and then writing them off as

"bad debt" and taking tax deductions; failing to provide Lender the benefit of its security interest provided for in the Loan Documents; commingling its funds and/or its other assets with those of other entities and/or individuals; and paying management fees to a Feit affiliate in excess of the amount permitted by the Loan Documents. *See* Fourth Am. Guaranty Compl. ¶¶ 34-37; 39, 41, 44 (POC Exh. 18). Any one of these defaults alone is sufficient to support Lender's acceleration of the debt, Default Rate interest, and costs of collection.

### D.    The State Court Actions

After Creekside Associates failed to make the required payments and otherwise defaulted under the Loan Documents, Lender instituted three matters in January 2012 in the Court of Common Pleas of Bucks County, Pennsylvania that relate to Creekside Associates and the Property (collectively, the "State Court Actions"). The first two matters involve confessions of judgment for money and possession against Creekside Associates for various defaults on its obligations under the Loan secured by the Property. Case Nos. 2012-00391-35 and 2012-00392-36 (since consolidated as the "Confession Actions"). The third matter is a foreclosure action on the Property resulting from Creekside Associates' failure to make the payments required under the Loan Documents.[3]  Case No. 2012-00393-37 (the "Foreclosure Action").

### 1.    Creekside Associates' Answers and Counterclaims

Creekside Associates answered each of the State Court Actions, asserting New Matter in each of them and arguing – for the first time, years after the fact and in direct conflict with the Pre-Negotiation Agreement – an alleged "modification" of the Loan Documents agreed to by the special servicer of Lender's predecessor-in-interest.    *See* Answer, New Matter, and

---

[3]    A fourth action has been filed, but does not relate directly to this Bankruptcy Action. That action is a guaranty claim against Israel Feit as the guarantor to the Loan Documents. Bucks County Court of Common Pleas, Case No. 2012-00757-33.

Counterclaims ¶¶ 37-40 (New Matter) (Goodchild Decl. Exh 13).[4]  Creekside Associates defends

its various other breaches of the Loan Documents by claiming that Lender (or its predecessor)

was aware of its actions and acquiesced to these breaches, *id.* ¶¶ 50, 52 (Answer), despite the fact

that the Loan Agreement specifically states that waiver is not a defense to any breach.   Loan

Agreement § 10.4 (POC Exh. 2) (noting that "[n]o delay or omission to exercise any remedy,

right or power accruing upon an Event of Default shall impair any such remedy, right or power

or shall be construed as a waiver thereof").   These positions are nothing more than a litigation-

driven tactic, chosen by new counsel who replaced the lawyer who represented Creekside

Associates during the events in question.

Creekside Associates also asserted counterclaims against Lender in the Confession

Actions, alleging causes of action for, among other things, breach of contract, fraud, and breach

of fiduciary duty.  *See* Answer, New Matter, and Counterclaims at pp. 40-57 (Goodchild Decl.

Exh. 13).   These claims are all premised upon the same alleged "modification" of the Loan

Documents by the special servicer.   Creekside Associates demanded a jury trial on its claims

against Lender.  *Id.* at p. 58.

The suggestion that there could have been an "oral modification" of the Loan was viewed

with skepticism by the state court right from the outset:

> You know, oral representation stuff [is] sort of interesting, but at the end of the
> day it seems to me I should be looking at documents, letters, written things. I'm
> not saying it would be impossible to have an oral modification between two
> entities such as this, but I'm saying for the most part we are talking about what
> should be sophisticated people running and controlling the legal liabilities of these
> entities.
> So I really–when you talk about the generalities and you have the right to walk
> away and stuff like that, all right, show me [the evidence].

Mar. 13, 2013 Hearing Tr. at 12:8–18 (Goodchild Decl. Exh. 14).

---

[4]       Nearly identical arguments were raised in the Answer and New Matter to the Foreclosure Action.

Then, in December 2013, the state court conclusively decided that, as a matter of state law, the "modification" asserted by Creekside Associates, even if proved, would be void for lack of consideration. *See* Dec. 5, 2013 Order (Goodchild Decl. Exh. 15) (concluding "that the alleged Modification Agreement entered into by the parties was not supported by consideration in that the Court does not accept Defendant's argument that Defendant's agreement not to surrender the property constituted valid consideration"). In June 2014, the state court went on to grant partial summary judgment to Lender, striking Creekside Associates' modification defense. *See* June 16, 2014 Order (Goodchild Decl. Exh. 20) ("The Court finds that Defendant's agreement not to surrender the property does not, as a matter of law, constitute consideration to support an alleged modification of the loan agreement.").

## 2.    Creekside Associates' Efforts to Avoid Trial

Stripped of its primary defense, Creekside Associates attempted to forestall a trial. Lender first filed an Omnibus Praecipe for Hearing, Trial or Argument on October 28, 2013 (Goodchild Decl. Exh. 31), and by Order of December 23, 2013, the Foreclosure Action was set for trial and placed in the January 27–February 10, 2014 trial pool. *See* Dec. 23. 2013 Order and Notice (Goodchild Decl. Exh. 16). Creekside Associates avoided a firm trial date for nearly eighteen months through the filing of numerous requests for continuance and emergency petitions to extend the trial date:

- Before the first trial listing, Creekside Associates filed an Emergency Petition to Strike Listing, or in the Alternative, for a Continuance, seeking to strike the trial listing and arguing that trial of the nonjury Foreclosure Action should be coordinated with the Confession Actions due to Creekside Associates' constitutional right to a jury trial of its claims against Lender. *See* Emergency Petition to Strike Listing, or in the Alternative, for a Continuance (Goodchild Decl. Exh. 22). The Foreclosure Action was not heard in the January 27–February 10, 2014 trial pool.

- When Creekside Associates learned the matter was to be relisted in the March 17–31, 2014 trial pool, it filed a new emergency petition to strike the trial listing on February 7,

2014. *See* Emergency Petition to Strike Listing, or in the Alternative, for a Continuance at 5-6 (Goodchild Decl. Exh. 23). That petition was denied by Order dated March 5, 2014 (Goodchild Decl. Exh. 17).

- Shortly before the start of the next trial pool, Creekside Associates moved for immediate certification of an appeal to the Superior Court of Pennsylvania regarding the Order granting partial summary judgment to Lender. *See* Mar. 24, 2014 Order (Goodchild Decl. Exh. 18). The trial court granted Creekside Associates' motion for certification of appeal, scuttling any chance of trying the Foreclosure Action in the March trial pool, though the Superior Court ultimately determined that the certification for appeal was improvidently granted. *See* May 27, 2014 Order (Goodchild Decl. Exh. 19).

- In August 2014,[5] Lender and Creekside Associates jointly requested that the Foreclosure Action and the Confession Actions be tried together and the State Court Actions were set for trial in the November 10–21, 2014 trial pool. *See* Oct. 7, 2014 Order and Notice (Goodchild Decl. Exh. 21).

- Over three weeks after receiving notice of the trial pool, counsel for Creekside Associates wrote the court administrator on October 31, 2014, noting his unavailability for a portion of trial pool. *See* Oct. 31, 2014 correspondence (Goodchild Decl. Exh. 24). On the first day of the trial pool, November 10, 2014, Creekside Associates requested to be removed entirely from the trial pool (Goodchild Decl. Exh. 25). Ultimately, the State Court Actions were not called in the November 10–21, 2014 trial pool.

The State Court Actions were finally set for trial in the January 5–16, 2015 trial pool as one of the first two settings (thereby ensuring the trial would go forward January 5, 2015 with two judges presiding over the pool). *See* Dec. 3, 2014 Trial Listing (Goodchild Decl. Exh. 26). Creekside Associates sought a continuance of this trial date as well (*see* Dec. 5, 2014 Correspondence (Goodchild Decl. Exh. 27)); however, the State Court Actions remained in the January 5-16, 2015 trial pool (*see* Dec. 15, 2014 Correspondence (Goodchild Decl. Exh. 28)). Three days later, with the trial date pending, Creekside Associates filed the Petition on December 19, 2014 (the "Petition Date"), automatically staying the State Court Actions. Dkt. No. 1.

---

[5]    The Foreclosure Matter was briefly included in the August 2014 trial pool, but was continued at Lender's request.

## IV.   ARGUMENT

Creekside Associates' Petition serves no valid bankruptcy purpose.   At the time of the filing of its Petition, Creekside Associates was perfectly solvent and only a few weeks from a trial in the State Court Actions that would fully and finally adjudicate whether it had been in default of its obligations to Lender, and how much it owes Lender.   All the other "claims" in the case were current at the time of filing and are easily payable with cash that Creekside Associates either has on hand or can get from Kerridge.   The real purpose of the Petition was to provide Creekside Associates the opportunity to use the Chapter 11 case to negotiate below-market financing of the amount owed Lender – all to the detriment of the unsecured creditors who now have not received the regular payments Debtor would otherwise have paid.

Section 1112(b)(1) of the Bankruptcy Code provides for the dismissal of a Chapter 11 case if the bankruptcy court determines such an action "is in the best interests of creditors and the estate."   The interests of equity security holders in the debtor are not a relevant consideration under Section 1112(b)(1).   In the Third Circuit, there are two principal situations in which a bankruptcy court may dismiss a Chapter 11 case for cause.   The first situation arises where the bankruptcy petition is not filed in good faith.   *Integrated Telecom*, 384 F.3d at 118; *SGL Carbon*, 200 F.3d at 162.   The second basis for dismissal arises where the debtor is unable to effectuate a feasible plan for exiting bankruptcy.   *In re DCNC N.C. I* ("*DCNC N.C.*"), *LLC,* 407 B.R. 651, 665 (Bankr. E.D. Pa. 2009); *In re 3 RAM, Inc.*, 343 B.R. 113, 117-18 (Bankr. E.D. Pa. 2006) ("While no longer an enumerated ground under amended § 1112, conversion or dismissal of a Chapter 11 bankruptcy case is appropriate where the court finds that the proposed plan is not feasible and that a feasible plan is not possible.").   Under either scenario, once a motion to dismiss is filed under Section 1112(b), the petitioner bears the burden to justify its invocation of relief under Chapter 11.   *Integrated Telecom*, 384 F.3d at 122.

### A.    Creekside Associates Cannot Demonstrate a Good-Faith Basis for Its Petition

All bankruptcy petitions must be filed for a good-faith purpose. The good-faith standard "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way." *SGL Carbon*, 200 F. 3d at 161-62. The standard is fact specific and applies broadly, including in contexts outside those at issue in *Integrated Telecom* and *SGL Carbon*. *15375 Mem'l Corp.*, 589 F.3d at 618 n.8. This case arises in the most familiar of those contexts: a dispute between a single-asset debtor and its all-asset secured lender. It presents the core construct of *SGL Carbon*: a motive to delay payments to creditors without benefiting them in any way.

Single-asset real estate cases provide ripe opportunities for debtors to improperly take advantage of the considerable equitable powers of Chapter 11. The good-faith requirement has frequently been applied in this single-asset real estate context to limit this potential for abuse. *See, e.g.*, *In re Primestone Inv. Partners L.P.*, 272 B.R. 554, 558 (D. Del. 2002) (affirming dismissal of bankruptcy petition that would serve only to disadvantage its sole secured creditor); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299 (Bankr. D. Del. 2011) (dismissing chapter 11 petition of debtor in single-asset real estate case); *In re State St. Houses, Inc.*, 356 F.3d 1345, 1347 (11th Cir. 2004) (affirming dismissal of bad-faith petition in single-asset real estate case).

There are two principal inquiries that are "particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *15375 Mem'l Corp.*, 589 F.3d at 618 (quoting *Integrated Telecom*, 384 F.3d at 119-20).

18

### 1.    Chapter 11 Is Not Necessary to Protect the Estate

This Chapter 11 case is not necessary to protect the "estate." Creekside Associates is a single purpose entity with one commercial property as its primary asset. Creekside Associates' financial condition has been steadily improving over the past three years – with increases in both liquidity and income. At the time of Petition, there was no pressure from unsecured creditors to collect from Creekside Associates. Feb. 19, 2015 Tr. 22:8–17 (Goodchild Decl. Exh. 1). Although their claims could easily be satisfied in cash, they are now stayed from collection by this proceeding. If Creekside Associates has its way, this will not be a short stay: Creekside Associates now seeks to extend the period of exclusivity through the summer, extinguishing any hope of a quick and orderly reorganization. The harm to the unsecured creditors caused by this inability to collect their debts is entirely unnecessary.

To have a proper purpose under the Bankruptcy Code, a petitioner must have some plausible reason to believe that the bankruptcy system is necessary to maximize the recovery of a debtor's creditors. *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 425 (Bankr. E.D. Pa. 2013), *aff'd sub nom.*, *Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768 (E.D. Pa. 2014). But here, there is no possibility that any creditor will benefit from Creekside Associates' Petition.

The unsecured creditors will not benefit. Prior to the Petition, all of Creekside Associates' unsecured creditors were being paid in full in the ordinary course. No unsecured creditors pressured Debtor prior to its Petition. It has sufficient cash on hand (and held by Kerridge) to pay all of the unsecured creditors' claims in cash. Even BCWSA – the lone unsecured creditor with a disputed liability – will not benefit from the Petition. Creekside Associates and BCWSA have an agreement structure to settle their dispute, and Creekside Associates has sufficient cash

on hand (or held by Kerridge) to repay in full even the highest possible amount of the debt claimed by BCWSA. All of the unsecured creditors have been delayed by this process from collecting what they should have received – payment in full in the ordinary course. Creekside Associates has now asked this Court for time to extend its exclusive right to file a proposed chapter 11 plan until August 18, 2015 – a full nine months from the Petition Date. Dkt. No. 128. During that time, the unsecured creditors' debts will remain unpaid unnecessarily. The Petition was filed solely to delay the foreclosure of the Property; the unsecured creditors are simply collateral damage in Creekside Associates' efforts to avoid litigating the State Court Actions.

Lender will certainly not benefit from the Chapter 11 case. Lender is the only secured creditor whose interest is secured by a mortgage on the Property. Lender was engaged in long-term litigation with Creekside Associates prior to the filing of the Petition, which was made on the eve of trial. Those State Court Actions are now stayed – preventing Lender from enforcing its contractual rights with Creekside Associates. Further, Creekside Associates has no prospect of increasing its revenues or cash through a reorganization of its business. Thus, there is no possibility that Lender may recover a greater portion of the debt owed it through Chapter 11.

Creekside Associates has no need of the estate-maximization tools of Chapter 11, such as the right to reject leases or contracts or to cap lease claims. There is no need here to sell off unprofitable businesses and reorganize around profitable ones. Nor is there any need to liquidate in an orderly fashion.

In fact, the apartment complex itself will be better protected *outside* of bankruptcy. It will continue to operate, collect rents, maintain the property, and pay its creditors. During the foreclosure process Lender will ensure that the going concern continues (if necessary through the appointment of a receiver), and unsecured creditors, vendors, and renters will all be unaffected.

*JER/Jameson Mezz Borrower II, LLC*, 461 B.R. at 299 (single-asset real estate case in which the petition was filed in bad faith to obtain the benefit of the automatic stay, when the already-commenced foreclosure would not affect operations but simply change ownership). In a going-concern foreclosure sale, whether Lender takes by bidding in debt, or a third party bidder bids cash, the Property will be transferred as a going concern and will continue to operate. In such a situation, all unsecured claims will be paid in full, and there is no reason to expect any negative change in ongoing vendor or rental relationships. *Id.* at 303-04.

The only dispute outstanding is the two-party dispute between Lender and Creekside Associates as to Debtor's claim of equity in the Property. If in fact there *is* equity value, it could have been preserved by refinancing the secured debt. During three years of prepetition litigation (throughout which time ample credit was available and interest rates were low), Creekside Associates might have arranged this financing. It failed to do so either because it is unwilling to pay market rates for refinancing, or because the Property cannot support the debt. Neither explanation is grounds for Chapter 11 relief. Good faith will not let a prosperous debtor cherry-pick bankruptcy provisions to improve an equity holder's negotiating leverage *vis-a-vis* creditors. *See Integrated Telecom*, 384 F.3d at 119-20; *Primestone Inv. Partners L.P.*, 272 B.R. at 558 (holding that "it would be inappropriate to arm Primestone with the powers of Chapter 11 to disadvantage its sole secured creditor"); *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 373 (5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365 (1988) (stating that if Chapter 11 plan does not have a rehabilitative purpose, the "statutory provisions designed to accomplish the reorganizational objectives become destructive of the legitimate rights and interests of creditors").

Simply put, Creekside Associates is not entitled to employ the "considerable powers" of Chapter 11 – "the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc. – [to] impose significant hardship" on its creditors. *SGL Carbon*, 200 F.3d at 165. Nor will the Bankruptcy Code permit the underwater single asset debtor to avoid its day of reckoning. *DCNC N.C.*, 407 B.R. at 664-65; *3 RAM, Inc.*, 343 B.R. at 119 (dismissing bankruptcy petition for cause where debtor "has only one asset which is fully encumbered"). This Court should dismiss the Petition as it is designed only to burden the sole secured creditor.

### 2. Creekside Associates Petitioned for Bankruptcy to Obtain a Litigation Advantage

It is well established that filing a Chapter 11 petition merely to obtain a tactical litigation advantage is an independent basis for finding bad faith and dismissing the petition. *Integrated Telecom*, 384 F.3d at 120 ("[B]ecause filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,' courts have typically dismissed Chapter 11 petitions under these circumstances as well.") (*quoting Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994)). "Dismissal based upon bad faith in filing has been deemed appropriate where the bankruptcy petition was filed as a litigation tactic, a forum shopping device and/or to resolve what is essentially a two-party dispute." *In re Argus Grp. 1700, Inc.*, 206 B.R. 737, 753 (Bankr. E.D. Pa. 1996), *aff'd*, 206 B.R. 757 (E.D. Pa. 1997) (citing *In re SB Props., Inc.*, 185 B.R. 198, 206 (E.D. Pa. 1995)). The only pressing issue for Creekside Associates at the time of its Petition was the pending trial with Lender in the State Court Actions.

It is apparent that Creekside Associates filed its Petition in the hope of avoiding the application of adverse rulings in the State Court Actions. The State Court Actions were scheduled for trial in January 2015 – less than a month before the filing of Creekside Associates'

Petition for bankruptcy protection. Throughout three years of litigation with Lender in the State Court Actions, Creekside Associates has argued that a modification of the Loan Documents excused its breach of the payment provisions. That question of state law, however, has been fully determined against Creekside Associates in the State Court Actions. *See* June 16, 2014 Order granting partial summary judgment to Lender (Goodchild Decl. Exh. 20) ("The Court finds that Defendant's agreement not to surrender the property does not, as a matter of law, constitute consideration to support an alleged modification of the loan agreement."). Creekside Associates now seeks to revive the loan modification argument before a new court. This is a clear abuse of the bankruptcy forum. *See DCNC N.C.*, 407 B.R. at 663-64 (dismissing bankruptcy petition filed after an unfavorable ruling in state court proceedings). Using a bankruptcy as a litigation tactic is an illegitimate purpose. Creekside Associates is attempting to use Chapter 11 to litigate (and relitigate) nonbankruptcy issues despite being financially solvent enough to pay its debts. This Court should dismiss a petition designed to frustrate litigation pending in state court.

### 3.    Numerous Additional Factors Favor a Finding of Bad Faith

While the lack of a valid bankruptcy purpose and the tactical litigation advantage secured by the automatic stay are indicative of Creekside Associates' bad faith in petitioning for bankruptcy, they are not the only factors this Court may consider in evaluating Creekside Associates' Petition. In determining whether cause exists to dismiss a petition for lack of good faith, courts may consider, among other things, whether (1) the debtor has few or no unsecured creditors; (2) the prepetition conduct of the debtor has been improper; (3) the petition effectively allows the debtor to evade court orders; (4) there are few debts to nonmoving creditors; (5) the petition was filed on the eve of foreclosure; (6) the foreclosed property is the sole or major asset

of the debtor; (7) the debtor's income is not sufficient to operate; (8) there was no pressure from non-moving creditors; (9) reorganization essentially involves the resolution of a two-party dispute; and (10) the debtor filed solely to create the automatic stay. *In re Stingfree Techs. Co.*, 427 B.R. 337, 352 (E.D. Pa. 2010); *SB Props., Inc.*, 185 B.R. 198. Each of the factors listed above is present here and weighs heavily in favor of dismissal of the Petition.

*The debtor has few unsecured creditors holding significant claims.* Lender is the only secured creditor and holds 95% of the outstanding claims against Creekside Associates, and BCWSA accounts for 93% of the scheduled unsecured claims. Dkt. Nos. 69, 73, 75. The only significant claims against Creekside Associates are held by these two entities, and BCWSA accounts for nearly all the unsecured debt. The remaining claims are for ordinary course liabilities that were current at the time of filing.

*The prepetition conduct of the debtor has been improper.* Creekside Associates began siphoning off funds to a nondebtor entity, Kerridge, owned and operated by family members of Feit in October 2009 – at least $6,260,856.11 was transferred prepetition from Creekside Associates to Kerridge, while only $300,000 has been repaid to Creekside Associates. Feit Dep. 87:16-22 (POC Exh. 13). Creekside Associates' prepetition conduct, essentially providing "loans" to a separate entity, is improper. These loans are particularly troublesome when some were made in response to the news that Lender had purchased the Note. Additionally, Creekside Associates' continued prepetition delay of the State Court Actions has hindered Lender's ability to enforce its rights. Creekside Associates has now successfully halted the State Court Actions through the automatic stay.

*There are few debts to nonmoving creditors.* As discussed above, Lender (the Movant) holds roughly 95% of the outstanding claims against Creekside Associates. BCWSA, holding 93%

of the unsecured claims, has indicated that it has no objection to this Motion. The remaining creditors' claims are minor and easily payable by Creekside Associates.

*The petition was filed on the eve of foreclosure.* The State Court Actions, including a foreclosure action, were scheduled to commence in January 2015, less than one month after the Petition Date. The Petition Date closely followed Creekside Associates' final attempt to postpone, yet again, the commencement of a trial in the State Court Actions.

*The foreclosed property is the sole or major asset of the debtor.* The Property is the only major asset of Creekside Associates – Creekside Associates asserts that the value of the Property is $84,000,000, which amounts to 91% of its assets listed in the Schedules. Summary of Schedules, Dkt. No. 69. The remainder of its assets is largely profits generated from the operation of the Property.

*There was no pressure from nonmoving creditors.* Creekside Associates has provided no indication that there was any pressure from creditors other than Lender. In fact, Feit testified to the contrary during the Section 341 Examination. Creekside Associates' only significant unsecured creditor, BCWSA, was involved in settlement negotiations with Creekside Associates to resolve its entire claim, a framework for the settlement was in place, BCWSA removed its liens on the Property and an escrow had been established. As a result, the only prepetition disputes with Creekside Associates were the State Court Actions with Lender. No other debts have been marked as disputed on the Schedules filed with the Court. *See* Dkt. Nos. 73, 75.

*Reorganization essentially involves the resolution of a two-party dispute.* Creekside Associates' only major asset, the Property, is the subject of the State Court Actions with Lender. Settlement negotiations have successfully occurred with BCWSA, Creekside Associates' largest unsecured creditor, and no other claims have been asserted against Creekside Associates. As

mentioned above, no other debts have been marked as disputed on the Schedules filed with the Court and, on Schedule B, Creekside Associates makes no mention of any litigation except the current State Court Actions.

*The debtor filed solely to create the automatic stay.* As discussed above, the State Court Actions were scheduled for trial one month after the Petition Date. Creekside Associates has provided no substantive discussion on any other reasons for the commencement of the Bankruptcy Case and, as described above, the Petition serves no rehabilitative purpose.

**B.    Creekside Associates Is Unable to Confirm a Plan**

In the Eastern District of Pennsylvania, the inability to confirm a plan, particularly in the single-asset real estate context, is recognized as an *independent* cause for dismissal. *See DCNC N.C.*, 407 B.R. at 664-65 ("Fundamental bankruptcy policy continues to support the proposition that the inability to propose a feasible reorganization or liquidation plan provides 'cause' for dismissal or conversion of a chapter 11 case on request of an interested party . . . . [T]he inability to effectuate a plan, by itself, provides cause for dismissal or conversion of a chapter 11 case.");[6] *3 RAM, Inc.*, 343 B.R. at 117-18 (Bankr. E.D. Pa. 2006) ("While no longer an enumerated ground under amended § 1112, conversion or dismissal of a Chapter 11 bankruptcy case is appropriate where the court finds that the proposed plan is not feasible and that a feasible plan is not possible."). And while filing to frustrate the execution efforts of a particular creditor is not *necessarily* an illegitimate bankruptcy purpose, single-asset filings on the eve of foreclosure will be dismissed when "the debtor ha[s] no realistic chance of successfully reorganizing." *See In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984); *DCNC N.C.*, 407 B.R. at 665.

---

[6]    This is true *even where good faith is found.* *DCNC N.C.*, 407 B.R. at 665 (holding that "the inability to effectuate a plan, by itself, provides cause for dismissal or conversion of a chapter 11 case").

Creekside Associates cannot confirm a plan under Section 1129(a)(10).  There is ample cash to pay unsecured creditors and Debtor has admitted its intent to make them whole.  *See* Feb. 19, 2015 Tr. 21:14–22:1 (Goodchild Decl. Exh. 1) (testifying that the unsecured creditors "will be paid in full").  If unsecured creditors are unimpaired, then there can be no impaired accepting class without (a) agreement from Lender; (b) an "artificial" impairment;[7] or (c) through gerrymandering the classes, an impermissible tactic.  *See In re Swedeland, Dev. Gp., Inc.*, 16 F.3d 552, 568 (3d Cir. 1994) (discussing limitation on debtor's right to classify undersecured mortgagee separately in order to create an impaired class that may accept the plan).  To date, Creekside Associates has not demonstrated any intention of proposing a plan that will be acceptable to Lender.  In fact, despite having filed its Petition more than three months ago, Creekside Associates has not made any proposal to Lender suggesting a means of resolving this bankruptcy.  Debtor now requests until August 18, 2015 to file a plan (Dkt. No. 128) – a date that falls *after* the maturity date of the Note.  The motion for extension, however, does not even suggest that Creekside Associates has arranged (or could arrange) take-out financing.  Creekside Associates has had three years since the filing of the State Court Actions to secure such financing – there is no reason to believe it could be any more successful now.

Lender has no intention of accepting a plan that impairs its rights.  Despite the apparent wherewithal to pay off its obligations under the Loan Documents, Creekside Associates has never made a single payment of principal to Lender.  Lender's secured position has already been harmed greatly by Creekside Associates' refusal to adhere to its obligations under the Loan Documents – Lender does not intend to further impair its interest in the Loan or the Property.

---

[7]    *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004), as amended, (Feb. 23, 2005); *In re Windsor on the River Associates, Ltd.*, 7 F.3d 127 (8th Cir. 1993) (finding that a delay in payment despite sufficient cash on hand to make all payments in full was included in plan solely to manufacture an impaired class to satisfy § 1129(a)).

Thus, any plan proposed by Debtor will not satisfy 11 U.S.C. §1129(a)(10). *In re Union Meeting Partners*, 178 B.R. 664, 681 (E.D. Pa. 1995) (denying confirmation of debtor's plan and noting the "futility and waste" of many single-asset debtor cases that attempt to "'cram down' a plan opposed by the debtor's primary secured lender"); *In re RYYZ, LLC*, 490 B.R. 29, 39 (Bankr. E.D.N.Y. 2013) ("Section 1129(a)(10)'s power is often most apparent in single asset real estate cases. Consistent with the two-party nature of such disputes, the impaired classes normally include insiders, the lender, and, depending on the case, a relatively modest group of unsecured creditors. As result of this, and by operation of 11 U.S.C. §§ 506(a), 1111(b)(1), and 1122(a), lenders often dominate the relevant impaired classes and prevent satisfaction of Section 1129(a)(10)"). Similar circumstances are found here, further supporting the dismissal of the Petition.

### C.    Alternatively, the Petition Should Be Dismissed Under 11 U.S.C. § 305(a)

"[D]ismissal under § 305 is left to the discretion of the Bankruptcy Court, which in making this decision, considers a wide variety of factors including but not limited to: who filed the bankruptcy petition, the availability of another forum to handle the pending disputes, the necessity of federal proceedings to achieve a just and equitable solution, the expense of the federal proceedings in comparison to the proceedings in another forum, the purpose of the party seeking to remain in bankruptcy court, the economy and efficiency of having the bankruptcy court handle the matter and the possible prejudice to various parties." *In re S. Canaan Cellular Invs., LLC*, 420 B.R. 625, 631 (E.D. Pa. 2009). All of the dismissal factors are present here.

There is principally only one significant dispute, and that dispute was being capably handled by the Bucks County Court of Common Pleas. The state court forum is not only available, but intimately familiar with the long history of the dispute through three years of

litigation of the State Court Actions. This familiarity will greatly benefit the economy and efficiency of the court and the parties. Conversely, resolving this dispute in federal court will necessitate raising numerous issues that have already been addressed or considered by the state court. As discussed above, the filing of the Petition was designed to frustrate the state court's consideration of this dispute. As a result, the estate has expended significant resources, and is very likely to expend even greater resources to litigate with Lender and to prepare a plan (which Debtor apparently believes will take until at least August 2015).

The legal questions at issue in the dispute between Lender and Creekside Associates are purely issues of state law, making the state court uniquely suited to address those issues. *See In re Mazzocone*, 183 B.R. 402, 421 (Bankr. E.D. Pa. 1995), *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) ("Because a bankruptcy court is often not the proper forum in which to adjudicate non-bankruptcy issues, litigation of such issues is frequently best left to the state courts and should not be imposed upon this specialty court unless necessary to resolve a bankruptcy-centered dispute."). Similarly, in *Argus Group 1700, Inc.*, 206 B.R. at 756, the Court characterized the case as "in essence a two-party partnership dispute that implicates purely state law issues," and found that there was no need for the federal court to resolve the dispute. Thus, there is no need for federal proceedings to resolve this dispute.

Here, the bankruptcy court is being used as a forum to resolve what is essentially a two-party state law dispute. Lender and Creekside Associates began litigation in state court in January 2012 over a confession of judgment. The determination of the enforceability of such a confession of judgment is purely within the realm of state law, and should be left to the state court to adjudicate. As the ongoing litigation began more than three years ago and was set for

trial, this Court's time and resources should not be imposed upon to resolve this nonbankruptcy-centered dispute.

## V.    CONCLUSION

For all the foregoing reasons, Lender respectfully requests that the Court dismiss the Chapter 11 Petition, and grant Lender such other relief as is just and proper.

Dated: March 27, 2015

MORGAN, LEWIS & BOCKIUS, LLP

By: /s  John C. Goodchild, III
John C. Goodchild, III (PA 74856)
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
jgoodchild@morganlewis.com